IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**THOMAS BROWN,**

      **Plaintiff,**

**v.**                                         **Civil Action No. 5:10cv93**
                                              **Judge Stamp**

**JOHN KING, Chief of Operations,**
**WV Regional Jail Authority; TERRY**
**MILLER, Executive Director;**
**WARDEN MICHAEL MARTIN,**
**Administrator TVRJ; MATTHEW BENNETT,**
**Correctional Officer, TVRJ; JOHN**
**DOE VANCE, Correctional Officer,**
**TVRJ; LT. RICHARD COX, Chief**
**Correctional Officer, TVRJ; and JOHN**
**DOE PIGLEY, Correctional Officer,**
**TVRJ,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I.  Procedural History

On September 8, 2010, plaintiff initiated this case by filing a civil rights complaint under 42 U.S.C. § 1983 in United States District Court for the Southern District of West Virginia. On September 14, 2010, an Order was entered transferring the case to this District.

Plaintiff is proceeding *pro se,* was granted permission to proceed *in forma pauperis* on October 12, 2010, and paid an initial partial filing fee on October 25, 2010. On December 16, 2010, the plaintiff was directed to provide the Court with proof that he had administratively exhausted his claims. On January 3, 2011, the plaintiff responded with copies of his grievance forms. On January 31, 2011, upon a preliminary review of the file, the undersigned determined that summary dismissal was not appropriate, and directed the United States Marshal Service to serve the Complaint.

On February 28, 2011, the defendants filed a Motion to Dismiss with a Memorandum of Law in support. Because the plaintiff is proceeding *pro se*, the Court issued a <u>Roseboro</u>[1] Notice on April 22, 2011. The plaintiff filed a response to the defendants' motion on May 19, 2011, to which the defendants replied on May 24, 2011.

On June 9, 2011, plaintiff filed a response to the defendants' reply, titled Plaintiff's Response to Defendant's (AMENDED Response/Answer) "Reply Memorandum of Law in Support of Defendant's [sic] Motion to Dismiss" and Plaintiff's Motion to Strike and/or Dismiss Pleading. On June 20, 2011, the defendants filed a Defendants' Response to: Plaintiff's Motion to Strike and/or Dismiss Pleading. On August 9, 2011, the undersigned recommended that the defendants' Motion to Dismiss be granted only as to defendants Sgt. Michael Wayne and Chad Cardinal Esq.; plaintiff's motion to deny defendants' motion to dismiss be granted with respect to all but defendants Sgt. Michael Wayne and Chad Cardinal, Esq.; plaintiff's motion to strike and/or dismiss the defendants' reply to plaintiff's response to defendants' Motion to Dismiss be denied; and that the remaining defendants be ordered respond to the claims made against them. Neither party filed any objections, and on September 13, 2011, the court adopted the Report and Recommendation in its entirety.

On September 15, 2011, the remaining defendants, King, Bennett, Cox, Martin, Miller, Pigley, and Vance answered the complaint. On September 20, 2011, the court entered its first order and notice regarding discovery and scheduling. Written discovery was exchanged between the parties. Discovery closed on March 30, 2012.

## II. The Pleadings

### A. The Complaint and Memorandum of Law (Dkt.# 2 and 4)

In the complaint, the plaintiff alleges that his Eighth and Fourteenth Amendment rights were violated when, despite being on notice of the potential for great harm, the defendants intentionally,

---

[1] <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir. 1975) (finding that the court must inform a pro se plaintiff of his right to file material in response to a motion for summary judgment).

sadistically, and with deliberate indifference to his safety and health, failed to protect him from assault by placing him in a pod with two inmates against whom he had existing "keep-away" orders.[2]

In support of his claims, plaintiff asserts that he entered the Tygart Valley Regional Jail ("TVRJ") on or about May 3, 2008 and that between May 3, 2008 and an unspecified date,[3] he was moved a total of thirteen different times because of various threats upon his physical safety and wellbeing, and/or verbal or physical altercations. He alleges that each of the defendants, acting under color of state law, individually and collectively participated in deliberately placing him into a cell block with Don Davis and Aaron Maynor ("Davis and Maynor"), two inmates against whom he had existing "keep away" orders.[4] Plaintiff contends that as a result of his placement in Davis and Maynor's cell block,[5] he was savagely kicked and beaten by them and "eight to ten" of "their buddies," sustaining a dislocated shoulder, a broken nose, a split lip, a facial fracture or fractures, and an eye that was "laying on his cheek" that had to be "pushed back into his skull." He avers he required a plate to fix his facial fracture(s); fifteen stitches to repair his lip; and emergency treatment at two different hospitals.

Plaintiff, an African American, alleges that upon his release from the jail's infirmary, in an attempt to have him savagely beaten again for the Caucasian defendants' sadistic viewing pleasure, the defendants then placed him into a pod where only Caucasian "hate mongering" self-professed Ku Klux Klan ("KKK") and Aryan Brotherhood inmates were housed, placing him in life-threatening danger of further attack.[6]

---

[2] Plaintiff's complaint actually states that the two inmates "had asked to be kept away from" him, but taken in context with the entire record, it appears plaintiff is alleging that he is the one who had asked to be kept away from them.

[3] A review of the record indicates that the 13 moves occurred between May 3, 2008 - September 7, 2008. (Dkt.# 103 at 2).

[4] Plaintiff does not indicate when the alleged pre-existing "keep-away" order or orders were initiated.

[5] Although plaintiff's complaint does not set forth the exact date on which the beating occurred, a review of the record reveals that the date was September 7, 2008.

[6] Plaintiff does not allege that any such attack ever occurred, or even that he was harassed or threatened with harm by the KKK/Aryan Brotherhood inmates in this pod.

Plaintiff alleges that defendants John King ("King") and Terry Miller ("Miller") were "responsible for the grievances" plaintiff filed; were aware of the "keep away" orders but did nothing to ensure his safety; tacitly authorized and were deliberately indifferent to the sadistic actions of the defendants who actually carried out the violations, in effect, acquiescing to his being severely assaulted.

As for defendant Correctional Officer Matthew Bennett ("Bennett"), petitioner alleges that Bennett knew or should have known about the keep-away orders, but in spite of that, moved him to the pod where the inmates who assaulted him were anyway; was physically present during the assault; and in an attempt to protect himself after the assault, "wrote a disciplinary fight against" plaintiff,[7] even though he knew plaintiff was only "covering up"[8] in order to attempt to minimize his injuries from the assault.

Plaintiff alleges that defendant John Doe Pigley ("Pigley") should have been aware of the keep-away order(s) in effect; should have known his life was in danger; was working the "Tower" on the day of his assault; and had a full view of the entire incident but did not respond in a timely manner, permitting him to be severely beaten before summoning assistance.

As to defendant Mike Martin ("Martin"), plaintiff alleges Martin was personally notified of the complaints plaintiff filed regarding his assault and the aftermath, but with "complete and utter deliberate indifference" ignored everything plaintiff wrote, giving tacit authorization to the acts of his subordinates who actually carried out the violations.

As to defendant John Doe Vance ("Vance"), plaintiff alleges that when he was finally released from the jail's infirmary after a week after the September 7, 2008 attack, Vance placed him

---

[7] Plaintiff claims that even though he was written up for fighting, there was never a hearing held concerning the matter. (Dkt.# 2 at 12).

[8] The Court presumes that by "covering up," plaintiff is intending to convey his position is that he was not fighting but merely trying to shield himself from the other inmates' blows.

in the pod with the hostile KKK and Aryan Brotherhood inmates. The plaintiff alleges that when he protested, Vance grabbed him by his injured arm that was still in a sling, twisted his hand, causing excruciating pain, then violently shoved him into a cell.[9] Plaintiff asserts that he immediately requested assistance from Vance's unspecified superiors who were present at the time, but his entreaties were met with "complete deliberate indifference." Further, he alleges, whenever Vance entered his cell, Vance threw objects at him, striking him, in an attempt to cause further harm. Plaintiff alleges that one Counselor Hatley witnessed this, and Hatley assisted him in writing up a grievance concerning it.[10]

Plaintiff alleges that defendant Lt. Richard Cox ("Cox") refused to take any pictures of his injuries after the assault; intentionally lied when asked why plaintiff was placed into protective custody; and was the one who, after plaintiff was released from the infirmary, actually directed Vance and "Wilt"[11] to place him in the pod with the Caucasian KKK and Aryan Brotherhood inmates.

Plaintiff contends that his injuries have never been completely repaired; he has not been able to get further medical attention for his injuries beyond initial emergency treatment; he is physically and mentally scarred; and is still in constant pain. He avers that he has exhausted his administrative remedies but that his complaints to jail authorities were met with "complete and utter deliberate indifference," "nothing was done," and the inmates who attacked him were never disciplined.

---

[9] It appears that this incident may be the incident that allegedly occurred on September 15, 2008, the date plaintiff purportedly filed a grievance against Vance for taking him to the floor, trying to break his left thumb and pulling his ear. Plaintiff alleges that when he screamed for help, Vance stopped when the help finally arrived. (Dkt.# 19-1 at 1).

[10] The grievance plaintiff filed as a result of this incident or incidents was filed on September 15, 2008 and is written in plaintiff's own handwriting. (Dkt.# 19-1 at 3). Although plaintiff alleges that "Ofc. Vance hit me with my things that were in my sheets" he does not allege he was injured as a result. There is another grievance, filed September 12, 2008, which appears it may be the one Counselor Hatley assisted plaintiff with; it is neatly written in another's handwriting with plaintiff's signature at the bottom, but it alleges verbal abuse, not an assault by thrown objects. (Dkt.# 19-1 at 2).

[11] Plaintiff did not identify who "Wilt" was, did not name Wilt as a defendant and made no further mention of him in his complaint.

As relief, the plaintiff seeks reimbursement of his filing fees and costs; and although he did not request compensatory damages, he requests $25,000.00 in punitive damages against each defendant, and any and all relief that the Court deems necessary and just.

## B.  The Defendants' Motion for Summary Judgment and Memorandum in Support (Dkt.# 102 and 103)[12]

In their motion, the defendants assert that they are entitled to summary judgment and plaintiff's complaint should be dismissed because there is no genuine issue as to any material fact and the plaintiff has provided no evidence to support his claims.  Defendants aver that to date, despite having had sufficient time in which to do so, the plaintiff has failed to identify the true identities of the John Doe defendants Vance and Pigley, and thus the excessive force and deliberate indifference claims against them should be dismissed with prejudice.  Further, all of the defendants assert that as public executives, they enjoy qualified immunity, shielding them from personal civil liability for official acts undertaken while acting within the scope of their authority.  They contend that because the plaintiff has failed to prove the essential elements of his deliberate indifference and excessive force claims, the claims fail as a matter of law and they are entitled to summary judgment.

## C.  The Defendants' Supplemental Memorandum in Support of Motion for Summary Judgment (Dkt.# 114)

The defendants contend that plaintiff's September 7, 2008 assailants were not "keepaways" until after the September 7, 2008 attack and therefore, the defendants, because they had no prior notice of danger, cannot be found liable under the Eight Amendment for the September 7, 2008 assault.

Defendants further aver that plaintiff's claim that they attempted to put him into the general population on September 15, 2008 so he would be attacked again for their "sadistic" viewing pleasure lacks merit.  They aver that plaintiff himself requested to be placed back into the general

---

[12] Because the defendants' motion incompletely addressed plaintiff's claims, by Order entered May 16, 2012, the defendants were directed to file a supplemental response.  (Dkt.# 108).

population and twice expressly denied being in fear for his safety in two Administrative/Protective Custody Segregation hearings, on September 19, 2008 and October 8, 2008. Despite plaintiff's October 8, 2008 reiterated denial of fears for his safety, defendants contend that two days later, while still in protective custody, plaintiff wrote letters to defendants Miller and King, claiming to be in fear for his life and requesting to be transferred back to the South Central Regional Jail.[13]

Defendants argue that plaintiff's excessive force claims against defendant Vance are without merit; could not have been responded to administratively by the defendants because plaintiff never filed them; thus they were not administratively exhausted and should therefore be dismissed.

Defendants contend that the plaintiff was provided all necessary and appropriate medical treatment and therefore, his claims of deliberate indifference to his medical needs are without merit. Finally, defendants argue that all grievances that plaintiff actually ever filed were appropriately handled by the defendants, thus plaintiff's claims fail as a matter of law.

**D.** **The Plaintiff's Advisory – Memorandum and Request for Additional Scheduling Orders by the Court Dkt.# 120)**

In his response to the defendants' supplemental memorandum in support of its summary judgment motion, the plaintiff only asserts that the defendants did not provide all the medical records they were directed to produce in the Court's May 16, 2012 Order regarding the supplemental response, and requests that the Court direct them to do so. After an August 9, 2012 Order to Show Cause why Defendants Should not be Held in Contempt and Setting Evidentiary Hearing and Argument was entered, an evidentiary hearing was held on August 15, 2012. Subsequently, status conferences on the issue were held on August 29, 2012 and September 5, 2012. Plaintiff's medical records were produced and filed under seal by the defendant on September 5, 2012; September 11, 2012; October 1, 2012; and October 4, 2012.

---

[13] Plaintiff is from Kanawha County, West Virginia where the South Central Regional Jail is located, in Charleston, WV. He was prosecuted in Kanawha County and his family resides there. Letter Grievance to Terry Miller, Executive Director WV Regional Jail Authority. Dkt.# 19-1 at 6.

## III.  Standard of Review

**Summary Judgment**

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986).  The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson at 256.  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment.  Id. at 248.   To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  Anderson at 248.  Summary judgment is proper only

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

## IV. Analysis

### A. Failure to Exhaust

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001).

The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes"[14] and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth at 741) (emphasis added). In addition, the Supreme Court has stated that "we will not read *futility* or other exceptions into statutory exhaustion requirements . . ." See Booth at 741, n. 6 (emphasis added).

In Woodford v. Ngo, 548 U.S. 81, 89 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons;" (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford, at 93 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 103.

---

[14] Porter at 524.

The West Virginia Regional Jail Authority makes available to its inmates a grievance procedure through which they may seek review of complaints related to the conditions of their confinement. Under this procedure, inmates must first submit a grievance to the Administrator of the facility in which they are confined. Upon receipt of the grievance, the Administrator may reject the grievance if it appears on its face to have been filed in bad faith, or if other administrative procedures exist that have not been utilized. If the grievance is rejected, the Administrator must advise the inmate of the rejection. If the grievance is not rejected, the Administrator may assign a staff member to investigate the complaint. Such staff is then required to submit a written report within forty-eight (48) hours. Within two days of receipt of the written report, the Administrator must provide a written decision which identifies the action taken, the reasons for the action, and the procedures that must be followed to properly appeal the decision. If the Administrator's response is unfavorable, the inmate may appeal to the Chief of Operation within five days of the receipt of the Administrator's decision. Upon receipt of an appeal, the Chief of Operations must immediately direct the Administrator to forward copies of all information relating to the inmate's grievance within two business days. The Chief of Operations may direct an investigation of the report be conducted and a written report be submitted within 15 days. Within 10 days of receiving all of the information related to the grievance, the Chief of Operations must provide a written decision which identifies the corrective action taken or the reasons for denying the grievance. If the Chief of Operations' response is unfavorable, the inmate may appeal to the Office of the Executive Director within five days of receipt of the Chief of Operations' response. To do so, the inmate must mail to the Executive Director, copies of the original complaint and all of the responses thereto. The Office of the Executive Director must respond to an inmate's appeal within 10 days of receiving all the information. Unless the inmate has been notified of an extension of time for a response, the inmate may move to the next stage of the grievance process if the inmate does not receive a response at the expiration of the time limit at any stage of the process. The grievance process must be concluded within 60 days, inclusive of any extensions.

1. **Defendants John King, Chief of Operations, WV Regional Jail Authority; Terry Miller, Executive Director; and Warden Mike Martin, Administrator, TVRJ**

To the extent that plaintiff is suing these individuals in their individual capacity, he has failed to state a claim. In order to establish personal liability against a defendant in a § 1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).

The plaintiff does not allege any personal involvement by these defendants in his placement in the pod where he was attacked on September 7, 2008; the alleged denial of proper treatment for the injuries sustained in the attack; or the subsequent placement in the pod alleged to contain nothing but Ku Klux Klan and Aryan Brotherhood inmates. Instead, he alleges these defendants are responsible for their staff and their staff's actions because they were aware of the violations and plaintiff's assault, via the grievances plaintiff allegedly filed, but failed to intervene or take measures to prevent them, but rather, merely acquiesced to or tacitly authorized the behavior of those who participated in the wrongdoing.

When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 Fed 2nd 1113 (4th Cir. 1982); Orum v. Haynes, 68 F.Supp.2d 726 (N.D.W.Va. 1999), or the following elements are met: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and (3) there was an affirmative causal link between the supervisors inaction and the particular constitutional injuries suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Id. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" Id.

In his complaint, although plaintiff asserts that he exhausted his administrative remedies,[15] elsewhere, plaintiff implies he has not, and is not required to do so. (Memorandum of Law, Dkt.# 4 at 4).[16] In his response to the court's order that he provide proof of administrative exhaustion, plaintiff stated he provides "seven different grievances . . . filed and *answers when the administrators gave recognition to the grievance."* (Dkt.# 19 at 1)(emphasis added).

To the extent that the plaintiff may be asserting that defendants King, Miller and Warden Michael Martin were deliberately indifferent to his safety and health needs by denying the October 10, 2008 "letter" administrative grievances he filed with King and Miller, requesting transfer from TVRJ after the assault,[17] his subsequent placement in various other pods where he was at risk, and his immediate and follow-up medical care for injuries sustained, any such claim is without merit, because that is not the type of personal involvement required to state a claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

A careful review of the plaintiff's complaint establishes that not only has he failed to assert credible allegations to support a finding that the elements necessary to establish supervisory liability are present against King, Miller or Martin, plaintiff also never properly initiated and completed the administrative grievance procedure regarding any claim in his complaint with King, Miller or Martin.

---

[15] Complaint, Dkt.# 2 at 10, ¶9.

[16] Plaintiff contends that pursuant to W.Va. Code § 25-1A-2(c) and White v. Haines, 618 S.E.2d 423, 432 (2005), because he is "alleging past physical abuse and therefore [he] is not required to exhaust administrative remedies before bringing this civil action." Dkt.# 4 at 4.

[17] Plaintiff never filed any grievance with defendant Warden Michael Martin. His October 10, 2008 letter grievances to King and Miller were sent without ever first filing an initial grievance with the jail administrator as required.

Accordingly, then, any claim he might have against any of them fails to state a claim upon which relief can be granted and must also be dismissed for failure to exhaust.

**2. Defendant John Doe Vance, Correctional Officer**

Attached to plaintiff's response to the Court's order directing him to prove administrative exhaustion, *inter alia,* were two grievances, purportedly filed on September 15, 2008, regarding actions allegedly committed by defendant Vance. On the first, plaintiff alleges an assault by Vance, who he claims took him to the floor, tried to break his thumb and pulled his ear. (Dkt.# 19-1 at 1).[18] On the second, he alleges Vance came into his cell and "hit me with my things that were in my sheets." (Dkt.# 19-1 at 3). He provided no further information and the grievances do not reflect any responses were given. Moreover, the plaintiff does not allege or provide any evidence that he filed any appeal grievances with the Chief of Operations or the Executive Director.

Attached to the defendant's supplemental motion to dismiss are copies of 48 administrative requests/grievances[19] filed by plaintiff between May 7, 2008 and October 8, 2008. Each has a dated response by jail staff written on the bottom. (Dkt.# 114-4 at 2 – 49). Nowhere among them are the two September 15, 2008 grievances[20] plaintiff produced, alleging the assaults by defendant Vance.[21] Defendants contend that neither of the two September 15, 2008 administrative grievances plaintiff produced alleging physical assaults by defendant Vance have any marking from the jail, acknowledging jail staff's receipt, to prove that the forms were ever actually submitted. (Dkt.# 114

---

[18] In his complaint, plaintiff alleges that this assault occurred one week after the September 7, 2008 assault, when he protested Vance's transferring him from the jail infirmary into the pod with the allegedly racist KKK and Aryan Brotherhood inmates.

[19] The same form is used for either a request or grievance; the inmate is directed to circle which remedy he seeks. On most of the requests/grievances plaintiff filed, he circled or underlined the word "request," or did not specify at all. On only two of the 49 did plaintiff circle the word "grievance." (Dkt.# 114-4 at 2 – 49).

[20] Plaintiff did not specify that the forms were for grievances, he circled neither the word "request" or the word "grievance." However, it is presumed from the allegations contained in them that plaintiff intended that they be grievances and they will be so construed here.

[21] There is another September 15, 2008 request filed to "Hatley," saying "need to make phone call about money and talk to you about other things." Dkt.# 114-4 at 39.

at 7). Defendants contend that neither grievance was found in plaintiff's inmate file because neither was ever provided to officials at the TVRJ. (Id.). Plaintiff has provided nothing to rebut this. It would appear, then, that plaintiff may have falsified documentation to create these two grievances after the fact, in order to show that he had actually timely filed them, when in fact, he had not. Even assuming that plaintiff did not falsify them, the record clearly shows that he did not complete the exhaustion process. Accordingly, the plaintiff has not fully and completely exhausted his administrative remedies as is required under the PLRA[22] and the excessive force claims against defendant Vance should be dismissed, and Vance should be dismissed from this case with prejudice. Moreover, even if plaintiff had completely exhausted these particular claims, the undersigned finds that they should be dismissed anyway, because they are frivolous and completely fabricated.

### 3. Defendant Matthew Bennett, Correctional Officer

---

[22] As for plaintiff's contention that W.Va. Code § 25-1A-2(c) and White v. Haines, 618 S.E.2d 423, 431 (2005), provide authority for relieving him of the obligation to administratively exhaust these claims, the undersigned notes that despite plaintiff's claim that Vance twisted his recently-injured arm till he screamed in agony, plaintiff produced no medical record to establish he was assaulted, injured, or sought medical treatment of any such injury on or near this date. By contrast, the defendants produced copies of plaintiff's complete TVRJ medical records and records of administrative grievances filed, showing no record of any report or complaint of injury or request for treatment arising out of this incident. Moreover, the defendants provide evidence to show that in a September 19, 2008 monitored phone conversation of a call plaintiff made, he was recorded telling his callee that he had been "placed on PC [protective custody] because of his medical condition and felt that if that was the case he should be housed in medical," and that "the section he laid down in was KKK which is why he created the disturbance." (Dkt.# 102-3 at 7). Plaintiff provided no evidence in support of this claim and offered no response to rebut defendants' contentions. It appears then, that plaintiff admitted to his callee that he "laid down" and deliberately "created the disturbance" in order to obtain placement elsewhere, and that there was likely no assault by Vance at all. The record also reveals that between September 16 – October 6, 2008, while plaintiff was safe in protective custody, his family repeatedly called the facility or the Central Office, claiming that plaintiff told them he was "in fear for his safety," had been "beaten up," was "unable to move his arms," and that his "eye [was] laying on his cheek." (Dkt.# 102-3 at 7). Defendants also provide evidence showing that during a September 23, 2008 monitored phone conversation with a family member, plaintiff was overheard saying "you need to keep calling them people to where they say what can we do to get you off our backs." (Id.). Accordingly, the undersigned not only agrees with the defendants that the claims lack merit, the undersigned finds that they are frivolous and fabricated.

Likewise, plaintiff produced no medical record supporting his claim that Vance ever entered his cell on any occasion, let alone multiple occasions, to strike him with thrown objects; defendants aver that investigation of these allegations found no evidence that any of the alleged conduct actually occurred. (Dkt.# 103 at 19). Moreover, the plaintiff's TVRJ medical records and administrative grievance file, produced by defendants, do not reflect plaintiff ever reported any such attack or sought treatment for an injury arising out of having objects thrown at him. Accordingly, the undersigned finds these claims to be false, fabricated, and frivolous. W.Va. Code § 25-1A-2(c) states "Not withstanding any other provision of this code, no inmate shall be prevented from filing an appeal of his or her conviction or bringing a civil or criminal action alleging past, current or imminent physical or sexual abuse; if such a civil or criminal action is ultimately dismissed by a judge as frivolous, then the inmate shall pay the filing costs associated with the civil or criminal action as provided for in this article."

Plaintiff alleges that defendant Correctional Officer Matthew Bennett knew or should have known about the keep-away orders; moved him to the pod where the inmates who assaulted him were anyway; was physically present during the assault; and in an attempt to protect himself after the assault, "wrote a disciplinary fight against" plaintiff, even though he knew plaintiff was only "covering up" in order to attempt to minimize his injuries from the assault. Because plaintiff did not even initiate the grievance process with regards to these claims, they must be dismissed for failure to exhaust. Further, the claims are completely without merit.

## 4. Defendant John Doe Pigley,[23] Correctional Officer

In his complaint, the plaintiff alleged that "Pigley was working the Tower [on September 7, 2008] and had a full view of the entire incident . . . [but] did not respond tho [sic] the initial assault in a timely manner, allow [sic] me to be beaten severely before summoning assistance . . . [and that] Pigley should have been aware of the "keep-a-way" [sic] order(s) that were in effect, and should have known that my life was in danger from the inmates who had initiated the orders." (Dkt.# 2 at 17-18).

The defendants admit Pigley was working in the Tower on the date of the fight and had a view of the fight from his position in the Tower, but deny that he intentionally delayed responding to the fight to permit the plaintiff to be more severely beaten before summoning assistance. (Dkt.# 58 at 6). Defendants provide evidence to show that from May 3, 2008 till September 7, 2008, plaintiff caused so many disturbances at the TVRJ, "due to his inability to get along with other inmates and related disciplinary issues, including fighting," that he had to be moved thirteen times between the seven available sections. (Dkt.# 114 at 2). On September 7, 2008, plaintiff's keepaway list had seven names on it; Don Davis and Aaron Maynor were not on the list, but were added after the attack, bringing the number to nine. (Defendant's Supplemental Memorandum of Law, Dkt.# 114-2 at 3 – 4). Thus, defendant Pigley cannot be found liable under the Eighth Amendment for being

---

[23] Defendant John Doe Pigley's true name appears to be Christopher Pingley; Pingley was the C Tower Operator Correctional Officer on September 7, 2008. (Dkt.# 114 at 3).

deliberately indifferent to any known danger to plaintiff, because neither he, nor any other named defendant, could have had any prior knowledge that Davis and Maynor posed a risk to plaintiff. To the contrary, the TVRJ incident reports filed on the day of the attack reveal that defendants took care to determine that none of plaintiff's keepaways were in the pod before he was moved there.[24] Despite that, within 5 minutes of plaintiff's arrival on C-5, the fight was called in. Correctional officers broke it up promptly.[25]

Because defendant Pigley was in the Tower, not working on the C5 Unit at the time of the September 7, 2008 assault, there is no set of facts that the plaintiff can show to establish liability on the part of Pigley. Moreover, plaintiff never filed any grievance regarding Pigley's alleged malfeasances, thus he has also failed to exhaust any claim he might have had against him, and accordingly, Pigley should be dismissed as a defendant from this action.

## 5. Defendant Lt. Richard Cox, Chief Correctional Officer

Plaintiff alleges that Cox refused to take any pictures of his injuries after the assault; intentionally lied when asked why plaintiff was placed into protective custody; and was the one who, after plaintiff was released from the infirmary, actually directed defendant Vance and "Wilt" to place him in the pod where no other inmates besides the KKK and Aryan Brotherhood inmates were housed. As for plaintiff's contention that Cox directed the other defendants to place him into the pod containing only white, racist KKK and Aryan Brotherhood inmates, the record reveals that that pod, as well as every other section in TVRJ in which plaintiff was placed, contained African-American

---

[24] On Sunday, September 7, 2008, Cpl. Robert Petrice ("Petrice") was assigned the duty post of booking officer for the 8am – 8pm shift. At 11:10 am, the B-Tower operator, Ann Hollen, advised that plaintiff, who was then housed in B-2, was yelling and screaming at the B-2 inmates, who had called her Tower to complain. She asked if he could be moved from B-2. Petrice checked the keepaway list and found that plaintiff had no keepaways in C-4 and advised her to move plaintiff there. However, at noon, C Tower Operator Christopher Pingley called booking to warn that C-4 placement would be problematic because plaintiff had a conflict with inmate Reuben Brown and others there, and advising that C5 would be better. After checking plaintiff's keepaway list, no keepaways were found on C5 and the move was approved at 12:05pm. Incident Report by Cpl. Robert Petrice. Dkt.# 102-2 at 4.

[25] "At 1210 CO Unrue and I transferred inmate Brown from B2 to C5, five minutes later COII Unrue called the fight." Incident Report by Matthew Bennett, Dkt.# 102-2 at 3. "At 1214 "inmate fight" called in C5. CO requested medical to C-pod." Prime Care Medical records. Dkt.# 114-7 at 37.

inmates.[26] (Dkt.# 102-3 at 7).   Moreover, the defendants provided evidence to show that it was not Cox who made the decision to move plaintiff to the pod, but Cpl. Petrice. (Dkt.# 102-2 at 4).

Plaintiff's claim that Cox "intentionally lied when asked why plaintiff was placed into protective custody" is vague, insufficiently pled and unclear, therefore it will not be given review. Although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990).   Moreover, although plaintiff did file an administrative *request* to Cox,[27] he never filed a formal grievance. Apparently because he received a prompt response from Cox, resolving the issue, plaintiff never initiated the formal process of utilizing the TVRJ's administrative grievance system, so this claim, as well, must be dismissed, not only because it  lacks merit and is frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i), but also for failure to exhaust.

## 6.  Failure to Protect

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk

---

[26] Indeed, as for plaintiff's implicit contention that the attack on him was racially motivated, one of the inmates who attacked plaintiff was Don Davis, also an African-American.  (Dkt.# 103 at 3).

[27] He requested "pictures of injuries for my attorney and documentation of what happened to me," Cox promptly responded the same day, advising "[t]his will be investigated by law enforcement.  You will have an opportunity to give a statement to them." (Dkt.# 19-1 at 4).

of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

There is no dispute that the plaintiff was assaulted by other inmates. In his complaint, the plaintiff alleged that two of the inmates who beat him "had asked to be kept away from" him. (Dkt.# 2 at 9). The defendants, on the other hand, assert the plaintiff "has no evidence that any of the Defendants . . . were aware of a specific risk [from Davis and Maynor] . . . " and that prior to the September 7, 2008 fight, neither Davis nor Maynor were on Plaintiff's non-association list[.]" (Dkt.# 103 at 14). After a review of plaintiff's keep-away list, the undersigned agrees.

Accordingly, because the record does not conclusively establishes facts sufficient to make any finding regarding whether any of the named defendants were aware of any facts from which an inference could be drawn that the plaintiff was at risk of injury at the hands of Davis and Maynor before the September 7, 2008 assault, the undersigned recommends that these claims be dismissed for failure to state a claim upon which relief can be granted. Moreover, because plaintiff never even initiated the grievance process with regards to this claim, it also must be dismissed for failure to exhaust.

**7. Medical Claims**

To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was sufficiently serious, and (2) that subjectively the prison official acted with a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 298 (1991). When dealing with claims of inadequate medical attention, the objective component is satisfied by a serious medical condition.

A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir.1987) *cert. denied,* 486 U.S. 1006 (1988).[28]

A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth, 834 F.2d at 347. Thus, while failure to provide recommended elective knee surgery does not violate the Eighth Amendment, Green v. Manning, 692 F.Supp. 283 (S.D. Ala.1987), failure to perform elective surgery on an inmate serving a life sentence would result in permanent denial of medical treatment and would render the inmate's condition irreparable, thus violating the Eighth Amendment. Derrickson v. Keve, 390 F.Supp. 905,907 (D.Del.1975). Further, prison officials must provide reasonably prompt access to elective surgery. West v. Keve, 541 F. Supp. 534 (D. Del. 1982)(Court found that unreasonable delay occurred when surgery was recommended in October 1974 but did not occur until March 11, 1996.).

The subjective component of a cruel and unusual punishment claim is satisfied by showing deliberate indifference by prison officials. Wilson, 501 U.S. at 303. "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Basically, a prison official must both be aware of facts from which the

---

[28] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F.Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008).

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, 511 U.S. at 837. A prison official is not liable if he knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent. Id. at 844.

As previously noted, the plaintiff alleges that on September 7, 2008, he was assaulted, resulting in his receiving a split lip; a dislocated shoulder; facial injuries or fractures, requiring a plate to be inserted; a broken nose and his "eye had to be pushed back into his skull" because it was "laying on his cheek." Without elaborating, plaintiff alleges that after his initial treatment immediately following the attack, he later sought further medical treatment but was denied it.[29]

Even if the court were to accept that the *present* status of plaintiff's injuries amounts to serious medical conditions,[30] the record as a whole disputes his claim that the defendants were deliberately indifferent to his serious medical needs when the injuries were first sustained, or that he was denied further treatment by the defendants after the initial medical care was provided. The plaintiff has provided no detail nor any information regarding any particular date on which he was denied care, let alone identified what medical condition or injury he sought care for, what treatment he sought, who denied it or why it was denied, nor has he provided any information at all about the current status of his alleged injuries, beyond saying he "has not had the damage totally repaired . . . is still in constant pain and cannot get the medical attention" needed.

The September 7, 2008 WV Regional Jail & Correctional Facility Incident Report, attached to the defendants' motion for summary judgment, indicates that plaintiff's visible injuries, as noted by the TVRJ staff immediately after the fight was broken up were "a cut approximately one inch in

---

[29] Although not alleged in his complaint, in his October 10, 2008 letters to defendants King and Miller, requesting to be transferred from TVRJ, plaintiff claimed that he needed "eye surgery," and that "I could lose my vision." (Dkt.# 19-1 at 6 and 7).

[30] In his complaint, the plaintiff alleges that he still has "constant pain" from his injuries and his physical injuries have "never been totally repaired." (Dkt.# 2 at 10).

length on his upper right lip several bruises to both sides of his face" and a dislocation of the right shoulder.[31] There was no mention of an enucleated eye "laying on" plaintiff's cheek. Another September 7, 2008 WV Regional Jail & Correctional Facility Authority Incident Report indicates that at 12:15pm, when the radio call came in advising "inmate fight in C-5," a nurse was also called to respond. Two nurses were escorted to the area. (Dkt.# 102-2 at 10). Jail staff noted that plaintiff was unsteady on his feet, disoriented and reported nausea. (Dkt.# 102-2 at 5). He was immediately placed in a wheelchair and taken to medical for treatment. (Id.). The nurse on duty noted

> @ 1214 "inmate fight" called in C5. CO requested medical to C-pod. I/M was sitting on the floor of hallway inmate had blood on his face & was c/o severe shoulder pain[.] (R) shoulder has deformed appearance, he had lacerations on (R) upper lip, (L) cheek was bruised & edematous, multiple abrasions on back chest arms & hands. Manipulate [sic] I/M (R) arm no relocation achieved. Assisted I/M up into w/c escorted to medical cleaned blood from face bleeding stopped. VS as follows 98.8 90 18 128/86. C/o nausea d/t pain. Informed by CO Unrue inmate struck in abd & back several times by other I/Ms notified Cpl Wilt Inmate would need transport to DMH ER called D. Hedrick RN notified per v/o Dr. Hahn. 1) transport to ER via van. Dr. Hahn/RJ___ LPN.

(Dkt.# 114-7 at 37 -38)

After the TVRJ nurse could not reduce plaintiff's dislocated shoulder, he was transferred to Davis Memorial Hospital in Elkins, WV, for further treatment of his injuries. The record reveals that plaintiff's injuries from the assault were abrasions and contusions; a right shoulder dislocation; a right corneal abrasion and right orbital fractures; and a 1-centimeter long laceration of the upper lip. (Dkt.# 114-3 at 2 - 3). He received multiple x-rays, abdominal, facial and orbital CT scans; his lip was sutured; his right shoulder was re-located and a sling was applied. (Id.). He was transferred directly from Davis Memorial Hospital's emergency room to WVU Medical Center's Ruby Memorial emergency room to be seen by an ophthalmologist from the WV Eye Institute, to rule out the possibility of any muscle entrapment in the fractures of bony orbit of the eye. No entrapment was found and it was determined that surgery was not necessary. (Dkt.# 114-7 at 5). The ophthalmologist

---

[31] Plaintiff apparently reported having dislocated his shoulder previous to the September 7, 2008 dislocation. (Dkt.# 102-2 at 5).

diagnosed a right corneal abrasion and right medial and right floor orbital fractures; repeated the CT scan of the orbits of his eyes; and prescribed an antibiotic and eye drops.

After being released from WVU's Ruby Memorial Emergency Department, he arrived back at TRVJ's infirmary at approximately 4:30 am on September 8, 2008. (Dkt.# 114-7 at 37).

He remained in the infirmary for 8 days, receiving nursing care, vital signs and neurological monitoring, antibiotics, non-steroidal anti-inflammatories, narcotics, and eye drops. (Dkt.# 114-7). His right arm was maintained in a sling. (Dkt.# 114-7 at 35). On September 11, 2008, x-rays of his knee were taken after he complained of pain and reduced range of motion in it.[32] (Dkt.# 114-7 at 2). On September 12, 2008, he was prescribed a muscle relaxant and a narcotic after complaining of right-sided back pain. (Dkt.# 114-7 at 33). By early the next morning, plaintiff reported that his back and shoulder felt "pretty good." (Dkt.# 114-7 at 33). Later that day he complained of constipation and was given a laxative to relieve it. (Id. at 32).

Plaintiff was taken to the WV Eye Institute for follow-up of his orbital fracture on September 15, 2008. (Id. at 31). The ophthalmologist noted that his corneal abrasion was healed but that he still had occasional double vision in his right eye that corrected with blinking; he had full extraocular muscle movement with some mild pain on the right while attempting extreme gaze to one side or the other. His right eye vision was 20/20; the left was 20/30. (Dkt.# 136-1 at 11). Based on the findings of this exam, he was released from the infirmary by the jail's Prime Care Medical, Inc. staff. (Dkt.#114 at 9 and 114-7 at 31). His right arm was still in a sling and he still had stitches in his lip. (Dkt.# 102-3 at 6 - 7).[33] On September 22, 2008, he was prescribed additional pain medication, medication was ordered for a pre-existing stomach condition and he began range of motion exercises. (Dkt.# 114-7 at 30)

---

[32] The knee x-rays were unremarkable.

[33] Upon staff's attempt to place him in a new pod that day, he lay down on the floor and screamed 'help me;" accordingly, he was moved to involuntary protective custody, where he continued to receive treatment for his injuries.

On October 6, 2008, he was taken back to the WV Eye Institute for follow-up and treatment; the exam showed continued improvement. (Dkt.# 136-1 at 7-9).[34] On October 13, 2008, he complained of back and shoulder pain; range of motion exercises were again discussed with him, lumbar spine x-rays were ordered. On November 6, 2008, the lumbar spine x-rays showed straightening of the lumbar spine, possibly due to muscle spasm. (Dkt.# 114-7 at 3).[35] The TVRJ Prime Care Medical records reveal that he was repeatedly seen, examined for various complaints and treated by the prison physician, RNs, or LPNs during the two-plus months he remained at TVRJ after the assault. (Dkt.# 114-7).

Despite the fact that between September 16 – October 6, 2008, plaintiff's family repeatedly called the jail or its Central Office, advising that plaintiff had told them he was "in fear for his safety," had been "beaten up," was "unable to move his arms," and that his "eye [was] laying on his cheek,"[36] it is apparent from even a cursory review of the record that plaintiff was in involuntary protective custody during that time and therefore, was in no danger at all. Further, his medical records do not show that he was ever unable to move his arms. Finally, in response to the October 10, 2008 letter grievance he wrote to defendant King, King wrote back on October 31, 2008, accurately advising plaintiff that "[y]ou are receiving adequate medical care for any medical issues that you may have." (Dkt.# 102-4 at 2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual

---

[34] Plaintiff had a follow up visit at the Eye Institute one year later, on October 30, 2009.

[35] Plaintiff was transferred out of TVRJ to Mount Olive Correctional Facility on November 12, 2008. (Dkt.# 114 at 12).

[36] (Dkt.# 102-3 at 7).

punishment unless exceptional circumstances exist.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).   A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health."  See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

Here, although it is clear from the record that the plaintiff did sustain serious injuries in the September 7, 2008 attack, it is likewise clear he received prompt, thorough, and appropriate emergency treatment, first at TVRJ's infirmary; then at two area hospital emergency rooms. Once his injuries were stabilized, he spent eight days at TVRJ's infirmary; and then had his injuries monitored and treated by an ophthalmologist outside the jail.  Upon release from the infirmary, he was placed into involuntary protective custody to protect him from further injury.

Plaintiff has not alleged that he has still has any serious medical condition, nor has provided any facts to substantiate his claim that the defendants were deliberately indifferent to his present allegedly serious medical needs.  In fact, Plaintiff's entire claim about the present status of his injuries is two sentences long:  "[t]o this day, Plaintiff still has not had the damage totally repaired. Plaintiff is in constant pain and cannot get the medical attention that is needed." This allegation is belied by the TVRJ Prime Care Medical records; the records of Davis Memorial Hospital; WVU Medical Center/Ruby Memorial Hospital; and the WVU Eye Institute, none of which show that plaintiff's right eye was ever "laying on his cheek," or that plaintiff ever had a broken nose, or facial fractures that required surgical insertion of a plate to fix, or needed surgery to preserve his vision. To the contrary, the records reveal that surgery was not recommended and not performed.[37]

---

[37] The October 6, 2008 W.V. Eye Institute records state: "S[ubjective]: Pt wants to have surgery → advised pt to wait because surgery may not benefit pt."  (Dkt.# 136-1 at 9).

In short, there is nothing in the medical records before the undersigned supporting plaintiff's claims that defendants were deliberately indifferent to his serious medical needs. To the contrary, the defendants' medical staff[38] was very attentive to him, and on one occasion, even lobbied successfully to get him in to see the ophthalmologist on an earlier date, when the WVU Eye Clinic tried to postpone a follow-up visit. (Id. at 31). During the relevant time period, although plaintiff sent two letter "grievances," requesting to be transferred back to the South Central Jail in Charleston, West Virginia;[39] he never filed a formal, first-level administrative grievance with the alleging any deliberate indifference to his medical needs. Accordingly, plaintiff's claims of deliberate indifference to his serious medical needs against all of the named defendants not only have so little merit that they are frivolous, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). Further, they are insufficiently pled,[40] and must also be dismissed for the failure to exhaust.

## V. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion for Summary Judgment (Dkt.# 102) be **GRANTED,** and the plaintiff's complaint (Dkt.# 2) be **DISMISSED WITH PREJUDICE**.

**Within fourteen (14) days** after being served with a copy of this recommendation, **or by November 15, 2012**, any party may file with the Clerk of the Court written objections identifying

---

[38] The TVRJ's medical staff who provided plaintiff's treatment are actually employees of Prime Care Medical, Inc., who plaintiff did not name as a defendant in this action.

[39] Although plaintiff did write two nearly identical letters titled "Grievance" on October 10, 2008 to defendant Miller of the WV Regional Jail Authority and defendant King, Chief of Operations, WV Regional Jail Authority, he did not first file the appropriate initial grievance of the issue with the Administrator of the TVRJ, in accordance with jail procedure.

[40] Pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, "[a] pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim *showing that the pleader is entitled to relief*, and (3) a demand for judgment for the relief the pleader seeks." (Emphasis added) "And, although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant." Migdal v. Rowe Price-Fleming International, Inc., 248 F.3d 321, 326 (4th Cir. 2001) (citation and internal quotations omitted).

the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated: October 31, 2012

    /s/ James E. Seibert
    JAMES E. SEIBERT
    UNITED STATES MAGISTRATE JUDGE